The opinion of the Court was delivered by
Glover, J.
On the application of the Relators, a rule was granted against the Respondents, in the first case, to show cause why a mandamus should not issue, directing them to re-apportion the stock of the “ People’s Bank,” agreeably to the charter ; and against the Respondents, in the second case, to show cause “ why one or more information or informations, in the nature of a writ of quo warranto, should not be exhibited against them, for exercising the offices respectively of President and Directors of the People’s Bank, and the franchises of a corporation under that style and title.”
The returns of the Respondents to these rules were heard, at October Term, 1853, and the rules were discharged, and from that judgment the Relators have appealed to this Court.
The questions presented for consideration by the grounds of appeal, in both cases involve the construction of an Act, incorporating the “ People’s Bank of South-Caroliua,” with seven other Banks.
By the first section of the Act, (12 Stat. 212,) the charter of the “ Planters and Mechanics’ Bank” is renewed, and subsequent sections impose additional liabilities and obligations. The seventh section provides for the renewal of the charters of the Union Bank and the Commercial Bank of Columbia, “with the same rights, privileges and obligations, and subject to the *317 same regulations and restrictions, as herein before provided, in relation to the Planters and Mechanics’ Bank.”
The “ People’s Bank of South-Carolina,” with seven other new Banks, is incorporated by the eighth section, which provides “ that said Banks shall have and possess the same rights and privileges, and be subject to the same duties, liabilities, obligations, regulations and restrictions herein provided, for the said Planters and Mechanics’ Bank and Union Bank and Commercial Bank.”
Sec. IX. “ The Comptroller General shall be authorized to appoint fit and proper persons as Commissioners, at Columbia and Charleston, or elsewhere, as he may decide, to open subscriptions, between the first day of April, and the first day of July next, to the capital stock of the eight Banks, respectively named in the foregoing section, and to require five dollars on each share from subscribers, in specie, or notes of specie-paying Banks of this State, and shall deposite the same in such Bank, as a majority of the subscribers shall designate, for the use of the respective Banks, on the first meeting of the subscribers. That, as soon as the subscription shall respectively be filled to the amount of the capital stock of each of the Banks respectively herein before named, it shall be the duty of the Comptroller General to notify said subscribers to meet, who shall thereupon become a body corporate, with the same privileges and rights as the Stockholders of the Banks whose charters are hereby renewed, and make all by-laws, not inconsistent with the laws of the land, to provide for the election of officers, the division of the capital stock as aforesaid, the payment of the subscriptions, and all arrangements to put into operation the charters hereby granted. Provided, That no one of the Banks hereby incorporated for the first time, shall issue any bill or note, or transact business, until satisfactory proof shall be given to the Comptroller General, that one-half of the capital stock of each Bank has been paid in, one moiety thereof, in gold or silver, and the other moiety in notes of specie-paying Banks. And, provided, further, That, in case of over-subscription to the *318 stock of any of the foregoing Banks, the said subscription shall be reduced pro rata; but no subscription of five shares, or under, shall be reduced; and it shall not be lawful for any person to subscribe for shares in the name of other persons.”
The grounds of appeal, and the argument, in both cases, suggest a preliminary inquiry into the corporate powers conferred, and the restrictions and liabilities imposed by this Act upon the “People’s Bank ofSouth-Carolina.”
A plain, literal construction of the eighth section manifests the intention of the Legislature to confer upon the new banks all the general powers and rights, and to impose all the restrictions and liabilities which had been conferred and imposed by the original charters of the Planters and Mechanics’, Union, and Commercial Banks, together with the additional liabilities, created by the other sections of the Act. The words used in the ninth section, still more clearly express this intention. The subscribers are declared to be a body corporate, “ with the same privileges and rights as the stockholders of the banks whose charters are hereby renewed.” For the charters of the new banks this language expressly refers us to the charters of the old. Where words of reference are employed, even in a subsequent statute, they will make a thing pass as well as if it had been particularly expressed. ( Wheatly vs. Thomas, T. Raymond, 54.)
It is objected that there-are contradictory provisions in the three old charters, which cannot be reconciled, and that a construction of the Act, which clothes the new banks with the charters of the old, may be within the letter, but not within the intention of the Legislature. It is generally safer to adopt that construction, which is warranted by the words used, than to conjecture what the Legislature meant. (1 T. R. 52.) A plain interpretation of the language employed leaves no doubt that the intention was, as it is expressed, to grant to the new banks the corporate powers contained in the old charters, which were renewed, subject to the restrictions and liabilities imposed by this Act. The Relators contend that the charter of the “ Planters and Mechanics’ Bank” was the standard, which the clause of *319 reference intended to adopt for the eight new banks. It might be enough to say, in reply to this view, that it is not supported by the plain reading of the statute, and, if such were the intention, we can say of the Legislature, quod voluit non dixit. (6 East, 518.)
Some provisions, in the several charters of the three old banks, may differ, and rights may be granted to one and withheld from the others ; but the grant of all corporate powers, necessary to conduct a banking institution, will be found substantially alike in all. Where differences exist, they generally relate to such powers as merely regulate the machinery of Banks, or are found in by-Jaws, which must necessarily differ; but a decision of the questions, made in the argument, does not involve a consideration of such contradictory provisions as may be found in the three charters which were renewed.
With these introductory views of the corporate privileges, rights and liabilities of the “People’s Bank of South-Carolina,” I proceed to consider, first, the questions made by the Relators, in their appeal from the judgment, discharging the rule to show cause why a mandamus should not issue, directing the Commissioners to re-apportion the stock of said Bank agreeably to the charter.
The object of the application for a writ of mandamus was to apportion the stock subscribed among the bona fide subscribers.
The ninth section of the Act authorizes the Comptroller General to appoint Commissioners to open subscriptions to the capital stock of the eight new banks, and adds, that “it shall not be lawful for any person to subscribe for shares in the name of other persons.” It is alleged by the Relators that persons were permitted to subscribe to the capital stock of the “ People’s Bank of South-Carolina,” in the names of other persons, but for the benefit of the. person making the subscription, and that the same is in violation of the Act incorporating said Bank. The performance of the duty, required of the Commissioners, by the rule, served upon them, is virtually to expunge such subscriptions, and apportion the stock among the remaining subscribers; *320 which suggests the previous inquiry, Were those subscriptions illegal ?
The language of Judge O’Neall furnishes a satisfactory construction of the clause of the Act relating to this inquiry. “ A literal reading of those words will exclude any subscriptions in the name of another person, whether by a bona fide power of attorney or not. This was clearly not intended. He who bona fide subscribed, under a power of attorney, for another person, was not acting in violation of the law.” The restriction applies to those who subscribed in the names of other persons ostensibly, but really for their own benefit. To the grant of valuable banking privileges, the General Assembly has imposed conditions and limitations ; and those who claim the benefits of the one, should not be relieved from the restraints of the other. If such be the plain meaning of the Act, its directions should have been pursued. Under the authority given to the Commissioners, “to open subscriptions,” their duty was not limited simply to act as silent witnesses to the registry of names, but should have been extended to a control over the legality of the subscriptions. Like managers of elections, they should have required those who claim the exercise of a privilege, to comply with the conditions which are imposed by law. If any doubt' could have been entertained respecting their duty in receiving subscriptions, that doubt was removed by a satisfactory construction of the Act, in an opinion obtained at the request of the Commissioners; and which, for a time, regulated the discharge of their duty in this respect. An abandonment, on their part, of the course which had been prescribed, invited capitalists to the violation of a provision, which they alone could have prevented. If the Commissioners entertained reasonable doubts, respecting the legality of any subscriptions, their duty was to require further evidence than the mere production of a power of attorney, to remove, any suspicions which attendant circumstances were calculated to produce. How could the requisitions of the law be enforced without the performance of such a duty by those who were charged with the receiving of subscriptions ?
*321 The Act provides “ that in case of over-subscription to the stock of any of the aforesaid banks, the said subscription shall be reduced pro rata, but no subscription of five shares, or under, shall be reduced.” An opportunity to compete with large capitalists was secured to subscribers of limited means. It concerned the public, that a policy, indicated by the General Assembly, should have been carried out; and, unless the Commissioners, at the time of subscription, enforced the law, persons would become members of a corporation, enjoying important banking privileges, contrary to the plain provisions of the Act, by which the charter was granted. This Court is of opinion that the Commissioners possessed, and should have exercised the power to prevent subscriptions, made contrary to the express directions of the Act. That subscriptions were made, in the names of persons, “ who had no interest in the stock, and claimed no control over it,” is proved by the deposition of G. W. King, who has thereby become a stockholder in the “People’s Bank” for 425 shares, in express violation of a provision of the charter; and, if he was not restrained from proving a breach of law by his voluntary affidavit, his readiness to satisfy the doubts of the Commissioners will be presumed. His, however, is not the only case shown, and it is not surprising that, then the door was thrown open, many who were influenced by the hope of large gains, entered and evaded an important provision of the charter.
In rendering a ready obedience to the law, and in a willing observance of its sanctions, public and private rights can alone be protected and secured. It is therefore, a subject of regret, thatthe Commissioners, who seemed to have been laudably anxious to know their duty, had not pursued the course which they first adopted.
It is manifest that, when the subscribers met and became a body corporate, some of the members represented stock, which had been illegally subscribed, and enjoyed the rights and privileges which that stock conferred; and the important question, suggested by this admission, is whether a writ of mandamus against the Commissioners, requiring them to re-apportion the stock, shall be ordered ?
*322 The judgment of the Court on this question will not require that full examination of the law of mandamus, which was so elaborately made by the counsel, in their argument of the cause.
Before an application for a mandamus a demand must be made of those from whom the performance of any particular act or duty is required, otherwise a party would be deprived of “ the option of either doing or refusing to do that which is required of him.” (Tapping on Man. 283.) . The notice served on the respondents, 25th April, 1853, and signed by R. Dulin, is the evidence oifered to prove the demand. The objection of R. Dulin to the legality of subscriptions; his direction not to pay over the money received from subscribers, and the expression of an intention to adopt legal proceedings, would hardly authorize the conclusion, that his purpose was to demand of the Commissioners that they should “ apportion the subscriptions and stock among the bona fide subscribers,” which is the language of the rule. So much of the notice as required the Commissioners not to pay over the money, was complied with, and showed a readiness, on their part, which rebuts the presumption of a refusal, if a distinct demand had been made for the per-mance of any other act. An objection, however, for want of a demand, comes too late, after the merits of the case have been discussed. (Tapping on Man. 287.)
Admitting that the relators have complied with the legal requisitions, which are necessary for the obtaining the writ, the next inquiry is, are the respondents the persons from whom may be required the duty of re-apportioning the stock of the “ People’s Bank,” agreeably to the charter 1
The ninth section provides for the appointment of commissioners to open subscriptions to the capital stock of the’banks respectively named ; to require five dollars on each share, from subscribers, and to deposit the same in such bank as a majority of the subscribers shall designate, for the use of the respective banks, on the first meeting of the subscribers.
When the subscriptions were closed and the money deposited, the duties of the Commissioners ceased, and as officers under *323 the appointment of the Comptroller General, they were functi officio. No authority is given to them to apportion the stock pro rata in case of over-subscription, nor can it be inferred from the direction to receive five dollars on each share from the subscribers, and to deposite the same. The directionis not to deposite the amount paid on 40,000 shares, the number among which the capital stock is to be divided ; but the aggregate amount paid on each share subscribed, for the use of the respective banks on the first meeting of the subscribers.
The subscribers, at their first meeting, are declared to be a body corporate, and they are then to receive from the Commissioners a list of the subscribers, with certificates of deposite for the whole amount of the subscription. It is on the corporation the duty devolved to reduce the subscriptionspro rata ; to divide the capital stock, and to make “ all arrangements to put into operation the charter granted.” Rules for the apportionment were provided by the Act, and the labor required could have been performed readily without the intervention of the Commissioners, whose offices terminated when the subscriptions were closed; and, consequently, they are not the persons charged with, or from whom the relators can require, the duty of re-apportioning the stock of the “ People’s Bank.”
But conceding to the Commissioners, the power of making an apportionment of the stock before the subscribers became a body corporate, it does not follow that they are still clothed with such power. The purposes of their appointment closed with their books of subscription and deposite of the money, and their official characters did not survive the existence of- the corporation. The practical difficulties, enumerated by Judge Frost, and which are inseparable from the exercise of such a power by the Commissioners, if they possessed it, would render a writ of mandamus nugatory if granted. The mandatory clause of the writ is framed in the alternative, to meet such a contingency; and if the return made to a mandamus si poteris, disclose facts and circumstances, showing the impossibility of performing what the writ commands, such special return will be good and will *324 supersede the issuing of a peremptory writ. A majority of this Court is of the opinion that the respondents have no power to re-apportion the stock of the “ People’s Bank,” and that the appeal of the relators from the judgment, discharging the rule, be dismissed.
At the same time, and on the application of the same relators, a rule was served on E. P. Starr, and others, to show cause whyan information in thenature of a writof quo warranto should not issue against them for exercising the offices respectively of President and Directors of the “ People’s Bank.” From the judgment of the Circuit Court, discharging the rule, the relators have appealed to this Court.
A mandamus and a quo warranto information are sometimes concurrent remedies, and it was fit that the relators should, if practicable, use the former writ, asan auxiliary process, to purge the subscription list, and thereby ascertain the legal voters; and it does not necessarily follow that a decision, discharging the rule in the mandamus, will conclude the application for a quo warranto. When an office is full defacto, the former, and not the latter, would be the proper remedy. (2 T. R. 259.) The assumption, on which the one is issued, is that what ought to have been done, at a time past, has not been done; (Tapp, on Man. 10,) the other calls in question the defendant’s title to the office, which he claims to exercise.
The allegation to sustain the rule for a quo warranto, against the respondents, is that, at the election held for President and Directors of the “People’s Bank,” illegal votes were cast, and that the respondents were not duly elected, or that the election was void.
G. W. King’s deposition alone is as satisfactory to prove that he gave illegal votes, as it is conclusive to show that his subscription was a palpable violation of the law. It was contended in the argument, that there was no corporation, and that the election is, therefore, void. If no corporation exist, it would be nugatory and fruitless to proceed any further in the quo war-ranto, and call in question a harmless and pretended claim, *325 where no civil right is in controversy. If there was no such corporation, there was no such officer, and it would be, as was said by Lord Ellenborough in Rex vs. Saunders, (3 East, 119,) as if a stranger had come into the town, and claimed to be President or Director.
By the terms of the charter, the subscribers became a corporation at their first meeting, and in that character they must be regarded. A quo warranto may issue, however, although the election be neither void nor irregular, as where the person elected did not obtain a majority of the legal votes. If, deducting the illegal voles given to the respondents, they had not a majority; or, if deducting the illegal votes, the other opposing candidates for President and Directors were elected, it would follow that they were not duly elected, and that their title is defective. (2 Nev. & Man. 487.) These facts, so necessary to maintain the position assumed by the relators, have not been established.
There are other objections urged against the application, which are entitled to great consideration, where the judgment of the Court rests on the exercise of a sound discretion.
A corporator’s interest makes him a good relator; yet by his acts he may forfeit the right, although the defendant’s title be defective. In the case of the King vs. Mortlock, (3 T. R. 300,) and the King vs. Stacey, (1 T. R. 1,) the rules were discharged. In the first place, the relator was party to an agreement not to enforce a by-law, the non-observance of which was the ground of his application; and in the other, objection was urged against an election at the iustance of oue who was present at, or concerned in, the election. Corporators, who attend and vote for the election of officers, are not competent relators to question the titles of those elected, if they knew of the objection on which they rely, (Rex vs. Slythe, 6 B. & C., 240.) “ It has generally been considered,” says C. J. Abbott, “a rule of corporation law, that a person is not to be permitted to impeach a title, conferred by an election in which he was concerned, or the titles of those mediately or immediately derived from that election.”
Numerous acts of acquiescence, on the part of the delators, *326 are in evidence, which directly affect their competency. They attended a meeting, which the Act declared to be a body corporate, participated in its deliberations, and acquiesced in its decisions, by accepting the excess of their subscriptions and canvassing and voting in the election of officers. These acts of assent and co-operation, with a full knowledge of all the objections to the validity of the subscriptions and legality of the votes, which they now allege, render them incompetent relators. In the argument, a participation which disqualifies, was limited to violations of the express provisions of the charter. The principle does not rest alone on a complicity in guilty acts; but also on a concurrence with, and an agency in, those proceedings and arrangements, which are necessary to put into operation the charter granted. It cannot be pretended that illegal subscriptions were not received by the Commissioners, or that illegal votes were not cast at the election; but it has been long held that an information should not go, of course; and the particular circumstances of these cases do not warrant the Court, in the exercise of a sound discretion, to grant the remedies which the relators seek.
The judgment of the Circuit Court, discharging the rules, is, therefore affirmed, and the motions are dismissed.
Motions dismissed.
Wardlaw, Withers, Whitner, and Munro, JJ., concurred.

Motions dismissed.